

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | |
|---|---|
| § | No. 08-18-00015-CV |
| § | |
| IN THE MATTER OF THE ESTATE OF § | Appeal from |
| § | |
| RICHARD C. POE, DECEASED | Probate Court No. 1 |
| § | |
| | of El Paso County, Texas |
| § | |
| | (TC # 2015-CPR00818) |
| § | |

**O P I N I O N**

The genesis of this case is a father who had second thoughts about entrusting his son with control of a substantial commercial enterprise. Near death's door, the father issued, and then bought for himself, enough stock in the managing company to place control of the enterprise into his estate whose executors were the father's trusted confidants. Following the father's death, the aggrieved son filed this action, which based on jury findings, set aside the new stock issuance and returned control of the enterprise to the son. During a second phase of the trial, the son sued the confidants individually over a claimed conspiracy and for damages to the enterprise. That phase of the trial resulted in a directed verdict in favor of the confidants, an order to reimburse the father's estate for what was paid for the stock, and an award of attorney's fees well below that requested by the son.

Not satisfied with the result, both sides have appealed and raise a myriad of issues in this double appeal. We affirm in part, and reverse in part the judgment below.

## I. FACTUAL BACKGROUND

The parties to this appeal are as follows. The defendants below, and Appellants here, include: (1) the Co-Executors of the Estate of Richard C. Poe, (Anthony Bock and Karen Castro); (2) The trustees of the Dick Poe Estate Trust, (Paul Sergent, Jr., Anthony Bock and Karen Castro); (3) the officers of Poe Management, Inc. (Paul Sergent, Jr., Anthony E. Bock, and Karen Castro). We collectively refer to these parties as Appellants. Paul Sergent, Jr., Anthony Bock, and Karen Castro were also sued as individuals. We collectively refer to them in that capacity as the "individual defendants." The plaintiff below, and Appellee/Cross-Appellant here is Richard C. Poe II. The suit arises from the following facts which we glean from the trial testimony and exhibits.

## A. The Dick Poe Commercial Empire

Richard C. Poe, who commonly appeared in commercials as "Dick Poe," operated three car dealerships relevant here: (1) Dick Poe Toyota, (2) Dick Poe Chrysler, and (3) Dick Poe Dodge. We will refer to him in this opinion as Dick Poe, or more simply, Dick. At the time of his death, Dick was divorced. He had two sons, Troy Poe and Richard C. Poe II (who we refer to as Richard). Troy was born with cerebral palsy and is totally disabled. Richard, however, had grown up working in the dealerships, obtained a college degree in automotive management, and by 2015 was running a successful Honda dealership of his own. The other important players here are Paul Sergent, Jr., Dick's long-time lawyer, Anthony Bock, Dick's long-time accountant, and Karen Castro, a long-time comptroller for the three dealerships. We refer to them by their last names: Sergent, Bock, and Castro.

2

Dick Poe's several dealerships were held in three limited partnerships: (1) Dick Poe Imports, LP, (Toyota); (2) Dick Poe Motors I, LP, (Chrysler); and (3) Dick Poe Dodge I, LP. (Dodge). Real estate holdings and other investments were held in two other limited partnerships: Dick Poe Family Limited Partnership and Poe Investments, Ltd. The general partner, and thus the entity that controlled all five limited partnerships, is a closely held corporation, Poe Management, Inc. (or PMI as we will refer to it).[1] As the general partner, PMI held a small ownership interest (1% to 5%) in each of the five limited partnerships it managed. But importantly here, as the general partner, it controlled all five of those limited partnerships.

The ownership of the five limited partnerships varied. Dick owned indirectly through two corporations 95% of Dick Poe Motors, L.P. (the Chrysler dealership) and Dick Poe Dodge, L.P. The third dealership, Dick Poe Imports, L.P. (the Toyota dealership), was owned 95% by the Dick Poe Family Limited Partnership. In turn, that entity was owned in equal shares by the Troy S. Poe Trust, and Richard. The land and improvements for the Toyota dealership was owned by the other limited partnership, Poe Investments, which in turn was owned 80% by Richard, and 19% by Dick. Graphically depicted, the corporate structure and ownership by 2015 was as follows, with the corporations in the shaded squares and the ownership interest outlined in the clear squares:

---

[1] A corporation is "closely held" if it has fewer than thirty-five shareholders and its stock is not publicly traded. *See* TEX.BUS.ORGS.CODE ANN. § 21.563.



PMI was formed in August of 2007. While the articles of incorporation allowed for 10,000 shares, only 1,000 shares were originally issued, and all were owned by Richard. None of the stock held preemptive rights and there was no shareholder's agreement. At the outset, Dick held an irrevocable proxy to vote Richard's shares until either Dick's death or December 31, 2017. In this way, ownership of PMI was held by Richard, but as the only director with a proxy for all voting shares, Dick controlled PMI and through it, the five limited partnerships that held the three dealerships.[2] The proxy, however, was jointly revoked on October 31, 2011, because Gulf States Toyota, the Toyota distributor, required it. Instead, for 2012 and each year thereafter Richard executed in August a "written consent" that would elect Dick as the sole director of PMI for the coming year or "until such other time as his successors are duly elected and qualified." Under this arrangement, on a yearly basis, Richard gave Dick control over PMI and the five limited

---

[2] PMI did not manage all the dealerships from its inception. Up until December 31, 2011 a corporation known as 6501 Texas Inc. was the general partner that managed the Chrysler dealership. Up until December 31, 2013, a corporation known as 1363 Texas, Inc. was the general partner that managed the Dodge dealership. Both of these entities were merged into PMI, and like PMI, Richard owned all the stock of each, but Dick held an irrevocable proxy to vote the stock.

partnerships for which it was the general partner. But as the only shareholder, Richard could have called a special shareholder's meeting and replaced Dick. Sergent had in fact advised Dick that Richard had the power to remove him as the sole director.

Aside from being the sole director, Dick was appointed the president of PMI. Richard held the vice president slot, and Sergeant was the corporation's secretary. But under PMI's bylaws, "[t]he business affairs of the corporation shall be managed by its Board of Directors" and Dick was the sole director. Richard testified the intent of this arrangement was that Dick would run the "family businesses" so long as he wanted to, and that upon Dick's death or retirement, control would pass to Richard. The arrangement also fit into an estate planning strategy where Dick could gift his ownership interest in the family businesses to his sons but remain active in the dealerships that he built. For instance, Dick had effectively transferred ownership of Dick Poe Toyota to his sons around 2010, yet he retained control through PMI.[3]

### B.  Dick's Wills

Dick executed a series of wills that reflected a changing view of his estate plan. According to a November 3, 2009 will, after some specific bequests to family and friends, three-fourths of the estate would have gone to Richard, and one-fourth to a trust set up for Troy (the Troy S. Poe Trust). Richard and Bock were also co-executors under the 2009 will. Dick's will of October 12, 2012, provided for a similar distribution and administration.

But in 2013, Dick's plan changed. That summer Dick discussed with his lawyer Sergent, and his accountant, Bock, the formation of a charitable foundation as a vehicle to donate some or all of his estate to charity. According to Bock, Dick also expressed a concern for Troy who had

---

[3] That transaction was accomplished by Dick selling his interest to the Dick Poe Family Limited Partnership, but the sale was financed by a note that Dick held, and later forgave. His sons--Troy through a trust, and Richard outright--owned the limited partnership in equal shares.

5

already outlived his life expectancy. Troy was primarily being cared for Angel Reyes, whom the trust had hired as a full-time care-taker. Dick purportedly feared that Richard would put Troy into an institution and discharge Angel after Dick's death. To that end, Dick executed a new will on October 24, 2013. After some specific bequests to other family and friends,[4] he gave all the residue of his estate to a newly formed "Dick Poe Estate Trust" for the benefit of Richard, Troy, and the newly created Poe Foundation. He named five persons as co-trustees of the estate trust: Richard, Bock, Sergent, Castro, and Gerald Miller (the general manager for one of the dealerships). The trustees had discretion on how they would divide the estate residue between the beneficiaries. The will appointed Richard, Bock, and Castro as co-executors.

The plan changed one more time. According to both Bock and Sergent, they met with Dick on September 10, 2014, at which time Dick asked that Richard and Gerald Miller be removed as trustees of the estate trust. The change was documented in Dick's September 22, 2014 will that appointed only Bock and Castro as executors, and a new estate trust agreement that named Bock, Castro, and Sergent as trustees.[5] Dick did not share the terms of this new will with Richard, who did not see it until after Dick's death.

Also, purportedly at this same meeting, Dick asked how he could regain control of his companies. Sergent told him the quickest and most efficient way was to buy stock in PMI. Sergent also contends the issue came up on November 3, 2014, when he again conferred with Dick on share issuance in PMI. Sergent claims that Dick said he was looking for a way to "stop Richard."

---

[4] The will set up a family and friends trust that designated specific gifts, such as a $ 2,000 payment to each full-time employee of the three car dealerships, and more substantial sums to named long-time employees. This trust had appeared in several earlier wills and the amount designated for these gifts increased with each new version.

[5] Additionally, in September 19, 2014, the Poe Foundation board of directors met and replaced Richard and Gerald Miller with James E. Rogers, Jr. (one of Dick's close friends) and John Attel (the then general manager of the Toyota dealership).

6

Sergent further claimed that three days after Dick signed the September 22, 2014 will, Dick called and wanted to discuss taking Richard out of the estate plan altogether. Sergent drafted a will to that effect, but Dick never signed it. According to Sergent, Dick came to his office to execute that will, but he appeared troubled. Sergent asked that he go home and think the matter over. Dick never mentioned the subject again.

### C. Improvement to the Toyota Dealership

In 2014 and 2015, the Toyota dealership underwent a major face lift. Dick lent just over $15 million dollars to PMI to tear down and reconstruct the facility. The dealership's then general manager, John Attel, was designated as the owner's representative during construction. And while by his own admission Richard had not been actively involved in PMI or the three car dealerships for the last ten years of his father's life, he was involved in the renovation. But some friction arose between Richard and Dick over design issues. For instance, Richard wanted to incorporate a clean energy image by including wind turbines and solar panels to generate electricity. Dick opposed the idea. Father and son also clashed over an on-site restaurant. Richard agreed that his father was more old school, while Richard "did things a little differently" but they both "got to the finish line."

### D. Richard and Dick negotiate the sale of the Chrysler and Dodge Dealerships

As our above graphic shows, while Dick had effectively gifted the Toyota dealership in equal parts to Troy's trust and Richard, he kept the majority ownership of the Chrysler and Dodge dealerships to himself. By the end of 2014, Dick and Richard discussed how Richard could acquire the ownership of those two dealerships.

According to Sergent, Richard initially proposed that he would buy the dealerships with Dick financing the purchase. Richard would make payments on the note until Dick's passing, at

7

which time the note would either be bequeathed to Richard, or simply cancelled. Dick was willing to sell the dealerships to Richard, however, he insisted that it had to be a cash deal. But according to Richard, Dick wanted the price of the dealerships to be as close as possible to zero, so long as the price was supportable by appraisals to avoid adverse tax consequences. Father and son then began negotiating the deal. As Dick's longstanding attorney, Sergent said he could not represent both sides on this transaction, and recommended that Richard obtain own counsel, which he did.

When the appraisers first finished with their work, Richard disagreed with the values. The Chrysler dealership appraised for $14 million and the Dodge dealership for some $10 million. Richard argued that the Chrysler dealership needed to be completely torn down and rebuilt. One of Richard's text messages forwarded to Dick described the Chrysler dealership as dangerous, with one section looking like an "atomic waste dump." These suggestions offended Dick.

Nonetheless, on March 19, 2015, Richard and Dick signed a letter of intent for the purchase. The letter outlined some terms of the proposed sale, tentatively valuing the real estate at $2.45 million, and the goodwill (or "blue sky") of the Chrysler dealership at $2 million and the Dodge dealership at $3 million. Each of these values, however, were subject to substantiation by an as yet to be performed valid appraisal. The formula for valuing for other assets were either agreed to or left "to be determined."

But the day before the letter of intent was signed, Sergent claims that Dick spoke to him about buying stock in PMI. They along with Bock discussed how much it would cost to assume control of PMI, and Dick was told that based on book value, the new shares would cost around two to three million dollars.

By April 10, 2015, the parties had exchanged drafts of an asset purchase agreement for the Dodge and Chrysler dealerships. The drafts reflected negotiation over specific issues like which

8

contracts would be assumed, the value of used car inventory, the value of parts inventory, and how current employees would be dealt with. As of April 13, 2015, several of these issues had still not been resolved.

Also brewing during this time-period was a precipitous downturn in Dick's health. By April 17, 2015, Dick was informed that his medical condition was terminal, and that he should consider obtaining hospice care. On May 1, 2015, Dick was in the hospital. The general manager for the Toyota dealership, John Attel, visited Dick that day. According to Attel, he discussed several on-going problems with the dealership renovations that Attel attributed to Richard. At the end of conversation, Dick instructed Attel to inform Richard that he had no authority over the project.

Moreover, on May 1, 2015, Dick asked Sergent to meet him at the hospital. According to Sergent, Dick gave him several directives. First, Dick instructed Sergent to notify everyone that the Chrysler and Dodge asset purchase deal was off. That same day, Sergent sent a communication to Richard's lawyer terminating the dealership sale negotiations.[6] Second, Dick instructed Sergent to inform Richard that he was not to oversee construction of improvements at Toyota dealership.[7] Third, he asked to have a guardianship set up for Troy. Fourth, and most relevant to this lawsuit, Dick instructed Sergent to move forward with the stock issuance for PMI.

### D. Dick Takes over Permanent Control of PMI

---

[6] Sergent's email to Richard's attorney first stated: "I met with Mr. Poe this morning and he instructed me to notify you and your client that the pending Chrysler-Jeep-Dodge-Ram asset purchase is off. He Is terminating further dealings on the matter, effective immediately."

[7] The next sentence of Sergent's email to Richard's counsel stated: "Further, and notwithstanding that Richard has been saying to various parties, Mr. Poe wants it known that at no time did he appoint Richard as the authorized or designated agent of Poe Investments, Ltd., with respect to the new dealership facility construction at Dick Poe Toyota. Mr. Poe is insistent that your client cease any further involvement in this, or any other matters involving Toyota dealership."

Following his meeting with Dick on May 1st, Sergent prepared a unanimous consent of the board of directors in lieu of a special meeting, effective May 1, 2015, that documented Dick's purchase of 1100 shares of PMI stock. Based on PMI's book value of $2,917,460, the purchase totaled $3,209,205. Bock had made the stock price calculation from book value in such a way as to not monetarily devalue Richard's 1000 shares. The new shares, however, gave Dick 52% of the voting shares. Castro prepared the check from Dick to PMI for $3,209,205 and took it to the hospital for Dick to sign on May 6, 2015.

Dick passed away on May 16, 2015. Richard did not learn of the stock issuance until after Dick's passing. Bock, who had provided accounting services to both Dick and Richard, had asked Dick if he could inform Richard of the matter, and Dick said he would think about it. He later supposedly told Bock that he "would prefer you not." The parties agree that the transaction had the effect of taking control away from Richard for PMI and all five of the family businesses for which it was the general partner. The parties hotly contested Dick's motivation for wresting control of PMI away from Richard.

According to some trial testimony, Dick had asked some in his circle of friends if Richard had or was using drugs (though no evidence of actual drug use was ever admitted at trial, and each of the witnesses asked about the matter denied that they had knowledge of any drug use; Richard emphatically denied ever using drugs).

Appellants also suggested that Dick may have been concerned that Richard had lost a substantial sum of money on a venture to develop a new brand of Tequila, and lesser sums on other business ventures. Richard responded by documenting his success in his own Honda dealership. He took over that dealership at age 26. At that time, the dealership has been open for 59 months and had lost money every single month. It was behind on its obligations, had been placed on

10

C.O.D. status by its suppliers, and Dick planned to close it. In the first month of Richard's management, however, he turned a small profit and has done so every month since, paying off the note to purchase the dealership seven years early. And while acknowledging losses in some of his investments, Richard documented that he has made more money than he has ever lost, a fact which even an opposing expert agreed to at trial.

Other testimony showed that Dick's primary concern was with Troy's future care. In the last few years of his life, Dick lived with Angel Reyes and Troy. Dick was very fond of Angel, and attributed Troy's long life to Angel's care. Dick may have perceived some animosity between Richard and Angel. Bock claims that Dick told him on May 1, 2015, that "I need to make sure Troy is taken care of. I don't know why Richard hates Angel so much, but I need to make sure Troy is taken care of and this [the stock issuance] is supposed to do it."[8]

For his part, Richard denied that he had any animus towards Angel, and emphasized that Angel has an employment contract with Troy S. Poe Trust guaranteeing his employment until 2030. Under the terms of the trust, Richard could not unilaterally cancel that contract because both trustees would have to agree. Richard also attacked the credibility of Sergent, Bock, and Castro, emphasizing that many of the statements they attributed to Dick were made in private conversations with no corroborating witness. He argued that Dick was manipulated into causing the share issuance, so outsiders could take control of the Poe family businesses contrary to Dick's longstanding estate plan.

### D.  Gulf States Toyota Balks at the New Share Issuance

---

[8] Bock also claimed that Richard told him around this time: "[H]is father was terminal, that he had spoken with Angel Reyes and told him that he would be assuming control of the family businesses and that if Mr. Reyes did not start following Richard's direction, that he would no longer be employed."

11

Dick Poe Toyota was party to a dealership agreement with Gulf States Toyota (defined as the Distributer in the agreement, and who we refer to as "GST"). That agreement states in relevant part:

> This agreement is a personal service Agreement and has been entered into by DISTRIBUTOR in reliance upon and in consideration of DEALER'S representation that only the following named persons are the Owners of DEALER, that such persons will serve in the capacities indicated, and that such persons are committed to achieving the purposes, goals and commitments of this Agreement.

The agreement then identifies the owners as: PMI (general partner with 5% ownership), Dick Poe Family Limited Partnership (limited partner with 95% ownership) and Richard as the "Dealer Principal."

> Another section titled "Change in Management or Ownership" provides:

> This is a personal service contract. DISTRIBUTOR has entered into this Agreement because DEALER has represented to DISTRIBUTOR that the Owners and the General Manager of DEALER identified herein possess the personal qualifications, skill and commitment necessary to ensure that DEALER will promote, sell and service Toyota Products in the most effective manner, enhance the Toyota image and increase market acceptance of Toyota Products. Because DISTRIBUTOR has entered into this agreement in reliance upon these representations and DEALER's assurances of the active involvement of such persons in DEALER operations, any change in ownership, no matter what the share or relationship between parties, or any changes in General Manager from the person specified herein, requires the prior written consent of DISTRIBUTOR, which DISTRIBUTOR shall not unreasonably withhold.

The issue was important enough to GST that it sent out a yearly letter to Dick reminding him that the dealership agreement required the *prior* written approval of GST for "[a]ny transfer of a direct or indirect interest in the Toyota Dealership among existing approved owners[.]"

On May 12, 2015, *after* Dick had already purchased the controlling interest in PMI, Sergent wrote to Laura Ryan, a Vice President of GST, requesting its consent for Dick's 52% interest in PMI. Sergent stated: "While this would not appear to constitute a change in ownership as contemplated by the Toyota Dealer Agreement since this would not change the financial and

operational risk to GST and/or TMS, out of an abundance of caution, Mr. Poe is requesting your consent. There will be no change in the director or officers of Poe Management, Inc." The transaction was described as an injection of capital into PMI and the verb tenses in the letter suggested the stock purchase had not yet taken place. Sergent's letter was carbon copied to Dick, John Attel, Anthony Bock, but *not* Richard.

One May 14, 2015, Laura Ryan replied to Sergent by writing: "Please be advised that requests of this nature cannot be considered without the written consent of Richard C. Poe, II as the authorized representative of the Dealer having the contractual relationship with GST, . . . ." Sergent responded to Ryan the same day, arguing there was no change in ownership as contemplated by the agreement, and he requested to discuss the matter further with GST. GST's Chief Legal Counsel then responded on May 26, 2015, acknowledging news of Dick's recent passing, and stating "we remain unable to approve the requested ownership change without the written consent of Richard C. Poe, II."

### E. The Fight for Control, Round One

Three days after his death, Bock and Castro as the named executors filed an application to probate Dick's September 22, 2014 will. On June 9, 2015, the El Paso County Probate Court Number One entered an order admitting that will to probate and authorizing letters testamentary for both Bock and Castro. On the same day, Richard, individually, and on behalf of PMI, sued Bock and Castro as executors of Dick's estate. The suit alleged in part that Dick violated his fiduciary duty of loyalty by engaging in a self-interested transaction without first obtaining independent approval. The suit sought rescission of the share issuance. The suit also sought an injunction preventing the estate from exercising control over PMI through the disputed share

13

issuance. Following an evidentiary hearing on July 28th and 29th, the probate court denied an application for temporary injunctive relief.

Under Dick's 2014 will, Castro and Bock as co-executors were given absolute discretion to vote Dick's stock. On August 3, 2015, by written consent of a majority of stockholders, they elected Bock as President and Castro as Vice-President of PMI. Sergent was elected Secretary. Richard was not invited to this meeting and was ousted from his role as Vice-President.

## F. GST is Drawn into the Fight

By September 2015, John Attel was still the general manager for Dick Poe Toyota, but he had failed GST's program for general managers and on September 1, 2015, GST notified Richard (the named Dealer Principal) that Attel needed to be replaced. Richard nominated Gerald Miller to fill the role as general manager, but Bock and Castro attempted to block that move. Bock wrote to GST stating that as of August 3, 2015, he was president of PMI and Richard's nomination of Gerald Miller as general manager was without effect.

GST saw the issue differently. It demanded by correspondence that Bock "immediately cease and desist from exerting any influence, direction, or control over Richard's ability to serve as the Dealer Principal" It attached to the correspondence an acknowledgment that Bock had executed years earlier where he stated he was not qualified to be approved as the final decision maker for the dealership. GST also served a letter on Richard dated September 30, 2015, noticing its intent to terminate the Toyota franchise.

Termination of dealership franchise agreements triggers the involvement of the Texas Department of Motor Vehicles. TEX.OCC.CODE ANN. § 2301.453(e)(f)(g)(right of dealer to protest termination and entitlement to a hearing before the board). The Board is given "exclusive original jurisdiction to regulate those aspects of the distribution, sale, or lease of motor vehicles that are

14

governed by this chapter." *Id.* at § 2301.151. On behalf of the Toyota dealership both Richard and Bock filed separate notices of protest, invoking an administrative proceeding before the State Office of Administrative Hearings (SOAH). The franchise termination thus proceeded through the administrative hearing process on a parallel track to this litigation.

### G. Richard is Placed Back in Charge of the Toyota Dealership

Following a hearing before the probate court, it entered an injunction on November 24, 2015, that placed Richard in possession and control of most functions for the Toyota dealership. Richard immediately hired Gerald Miller as the general manager. The court's order kept Castro and Bock in control of PMI.

Later during the litigation, Richard, GST, and the affected parties reached an agreement whereby Richard bought out the respective interests of PMI, the Dick Poe Family Limited Partnership, and Poe Investments, Ltd. related to the Toyota dealership. The transaction was structured in such a way to meet GST's condition that Castro, Bock, Attel, and Sergeant would not be involved in the dealership. Based on those discussions, GST abated its efforts to terminate the dealership franchise agreement, and the deal was finalized during the pendency of this litigation. But this agreement did not resolve the lawsuit: PMI, still under the control of Bock and Castro, continued to run the Dodge and Chrysler dealerships.

### II. PROCEDURAL BACKGROUND

Following discovery and the denial of several cross-motions for partial summary judgment, the case proceeded to a jury trial on Richard's eighth amended petition. That petition asserts that Richard is entitled to sue individually, and derivatively on behalf of PMI. Relevant to this appeal, the petition asserts these claims:

1. Declaratory relief to set aside the stock issuance as a self-dealing transaction that is not exempted by TEX.BUS.ORG.CODE ANN. § 21.418;

15

2. That Dick breached his fiduciary duty to Richard; a duty established by a 'confidential relationship' that existed between the two;

3. That Dick breached his fiduciary duties to PMI;

4. That Sergent, Bock, and Castro breach their fiduciary duties as officers of PMI;

5. That Sergent, Bock, Castro conspired along with Dick to breach Dick's fiduciary duties Richard and PMI;

6. Declaratory relief seeking to establish that Dick lacked the mental capacity to agree to the share issuance;

From these claims, Richard sought to set aside the stock issuance. For several of the claims, he also asked for compensatory, consequential, and punitive damages. Richard also sought his attorney's fees under TEX.CIV.PRAC.&REM.CODE ANN. § 37.009 (allowing the award of attorney's fees in declaratory judgment actions). Bock, Castro, and Sergent in their representative capacities sought their own declaratory relief including that Dick did not violate any formal or informal fiduciary duty, the stock issuance complied with Section 21.418, and the stock issuance did not violate the Toyota dealer agreement. They too sought their attorney's fees.

The probate court bifurcated the trial into two phases. The phase-one-trial would resolve whether the share issuance was valid or invalid, which would involve three issues: (a) Dick's mental capacity; (b) whether Dick breached a fiduciary duty; and (c) whether the share issuance was valid under Section 21.418 of the Business Organizations Code. If needed, the phase-two-trial would address the conspiracy, any damages to the corporation, and the individual liability claims.

## A. Phase-One-Trial: The Share Issuance Questions

In the multi-week phase-one-trial, the jury returned a verdict that made two essential findings. First, the jury found in answer to Question One that a "relationship of trust and confidence" existed between Dick and Richard, thereby imposing a fiduciary duty on Dick. Related to that claim, the jury failed to find in Question Two that the relationship terminated before

16

May 1, 2015.  In Question Three, the jury failed to find that Dick satisfied his fiduciary duties to Richard.

The second essential finding involved the "fairness" of the stock issuance.  Under Section 21.418 of the Business Organization Code, an otherwise valid self-dealing transaction by a director is not void or voidable if it is deemed fair to the corporation, or is it ratified by a majority of disinterested directors, or a majority of the shareholders.  TEX.BUS.ORGS.CODE ANN. § 21.418(b)(1) and (2).  In Question Four, the jury failed to find that the transaction met any of those conditions.

Prior to submission of the questions to the jury, the trial court had granted a directed verdict against Richard's claim that Dick lacked the competence to engage in the share issuance transaction.

### B.  Phase-Two-Trial: Conspiracy and Mismanagement

During the phase-two-trial, Richard limited his suit to claims against Sergent, Bock, and Castro individually, and disclaimed seeking any recovery from Dick's estate.  At the conclusion of Richard's case, the individual defendants moved for a directed verdict on several grounds that we explain in more detail below.  The probate court granted the instructed verdict and discharged the jury.

### C.  The Trial Court's Judgment

Based on the jury findings in the phase-one-trial, and the probate court's several other rulings, it issued a final judgment that declared the share issuance invalid and unenforceable.  The judgment also provides, however, that PMI must return to Dick's estate the $3,209,205 consideration paid for that stock.  Next, the court entered a take nothing judgment in favor of Sergent, Bock, and Castro on the individual liability claims asserted against them.  Finally, Richard

17

was awarded $232,455.62 in attorney's fees, which was far less than the $1,186,000 that he had sought in a post-trial filing.[9] Both sides filed notices of appeal. We start with Bock, Castro, and Sergent's issues in their representative capacities.

## III. APPELLANTS' ISSUES

The trial court's judgment invalidating the 2015 PMI stock issuance is based on two grounds: (1) the jury's failure to find in Question Four any of the "safe harbors" for an interested director transaction under Section 21.418 of the Business Organizations Code; and (2) the jury's finding in Question One and Three that Dick owed and then breached a "confidential relationship" to his son Richard. Appellants raise a series of challenges to each of those grounds, and several broader challenges to the trial court's admission of evidence. We begin with the issues germane to Question Four and the Section 21.418 safe harbors.

### A.  Section 21.418 Safe Harbors--Question Four

As this Court noted more than twenty years ago, "[n]early everywhere, and certainly in Texas, it is well established that officers of a corporation, by virtue of their authority, privileges and trust, have a strict fiduciary obligation to their corporation." *General Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex.App.--El Paso 1995, writ denied), *citing International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963). That fiduciary obligation gives rise to a duty of loyalty such that a corporate officer or director cannot place their personal interests over those of the corporation. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex.App.--Texarkana 2004, pet. denied)("The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation."). We

---

[9] Richard has also asserted claims for an accounting in the estate, removal of the trustees based on their hostility to him, and modification of a TRO. Those claims were severed into a separate proceeding and are not before us.

have required a corporate director and officer to exercise a "extreme measure of honesty, unselfishness, and good faith" in self-dealing transactions. *Torres*, 915 S.W.2d at 49.

But even at common law, self-dealing transactions were not automatically void. Instead, they were "voidable for unfairness and fraud with the burden upon the fiduciary of proving fairness." *Holloway*, 368 S.W.2d at 576. Additionally, at common law a vote by disinterested board members could ratify an otherwise voidable transaction. *Tenison v. Patton*, 67 S.W. 92, 95 (Tex. 1902). Other courts upheld self-dealing transactions when they are fair to the corporation and after full disclosure, the majority of the stockholders ratified the transaction. *Wiberg v. Gulf Coast Land & Dev. Co.*, 360 S.W.2d 563, 567 (Tex.Civ.App.--Beaumont 1962, writ ref'd n.r.e.).

Those common law savings rules are now codified by Section 21.418 of the Texas Business Organizations Code. That provision states that an otherwise valid and enforceable transaction "is not void or voidable," if one of several conditions are met. The stated conditions include:

> (1) the material facts as to the relationship or interest . . . and as to the contract or transaction are disclosed to or known by:
>
>> (A) the corporation's board of directors or a committee of the board of directors, and the board of directors or committee in good faith authorizes the contract or transaction by the approval of the majority of the disinterested directors or committee members, regardless of whether the disinterested directors or committee members constitute a quorum; or
>>
>> (B) the shareholders entitled to vote on the authorization of the contract or transaction, and the contract or transaction is specifically approved in good faith by a vote of the shareholders; or
>
> (2) the contract or transaction is fair to the corporation when the contract or transaction is authorized, approved, or ratified by the board of directors, a committee of the board of directors, or the shareholders.

TEX.BUS.ORGS.CODE ANN. § 21.418.

Appellants urged that Dick's purchase of the controlling interest in PMI fell within the "fair to the corporation" safe harbor. They submitted a proposed jury question that would have asked:

> Was Dick Poe's issuance of 1,100 shares of stock to himself on May 1, 2015, fair to Poe Management, Inc.
>
> In answering whether the share issuance was fair to Poe Management, Inc., you should consider all circumstances surrounding the transaction.

Richard also proposed a safe harbor question, but it differed in several respects. While it had the fairness inquiry, it did not include a specific date. It also added the provisions for approval by a majority of disinterested directors, or approval by a shareholder's vote.[10] The trial court submitted a hybrid of the two which more closely tracked Richard's question. In this case, the jury was asked and answered "No" to the following question:

> Is the share issuance valid and enforceable under the Texas Business Organizations Code?
>
> The share issuance is valid and enforceable if any one of the following conditions is satisfied:
>
> (1) the material facts as to the share issuance were disclosed to or known by:
>
>> (A) PMI's board of directors, and the board of directors in good faith authorized the share issuance by the approval of the majority of the disinterested directors, or
>>
>> (B) the shareholders entitled to vote on the share issuance, and the share issuance is specifically approved in good faith by a vote of the shareholders; or
>
> (2) the share issuance is fair to PMI when it is authorized, approved, or ratified by the board of directors or the shareholders.
>
> In answering whether the share issuance was valid and enforceable, you should consider all circumstances surrounding the transactions.

---

[10] Richard's requested issue was as follows:

Did Dick comply with all of the following duties?

The share issuance is valid and enforceable if any one of the following conditions is satisfied:
(1) the material facts as to the share issuance were disclosed to or known by:

> (A) PMI's board of directors, and the board of directors in good faith authorized the share issuance by the approval of the majority of the disinterested directors, or
>
> (B) the shareholders entitled to vote on the share issuance, and the share issuance is specifically approved in good faith by a vote of the shareholders; or

(2) the share issuance is fair to PMI when it is authorized, approved, or ratified by the board of directors or the shareholders.

Appellants here contend that (1) the jury's answer to question four is immaterial because it is a pure question of law (Issue One); (2) it fails to include the relevant date at which the transaction must be judged (Issue Two); (3) the negative finding is not a sufficient basis to enter a judgment in Richard's favor (Issue Three); and (4) the issue is improperly worded because it submits a shareholder voting question which was not applicable to this case (Issue Ten and Eleven, part 5). We start with the last issue--the form of the question.

### 1. *Question Four included unnecessary language, but it was harmless error.*

Appellants contend in their tenth issue and a subsection of their eleventh issue that Question Four included language not supported by the evidence, and that it improperly commented on the weight of the evidence. "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)(also noting "[t]he trial court has considerable discretion to determine necessary and proper jury instructions."). One way a trial abuses that discretion is by acting in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). One guiding rule states that the trial court "shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R.CIV.P. 277. Case law has added that "[a]n instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). And when a court submits a statutory claim, it "should track the language of the provision as closely as possible." *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

Under this record, there was no evidence to support the inclusion of the disinterested-director or shareholder-ratification safe harbors. Dick was the sole director, and he was not

21

"disinterested." By virtue of the transaction, he became a majority owner in PMI. That ownership interest in turn gave him an ownership interest not only in PMI, but in Dick Poe Imports, L.P. and Dick Poe Family Limited Partnership, which as of May 1, 2015, he held no ownership interest. Sergent, Dick's own lawyer, agreed that the disinterested director section does not apply to this case. Because there was no evidence of a disinterested director approving the transaction, that charge language was superfluous.

So too was the charge language on approval through a shareholder vote. The parties contested below whether the by-laws gave Richard the right to notice of the stock issuance. But the evidence was uncontroverted that Richard was not told of the stock issuance until after the purchase had been made and he never voted to ratify it. Sergent also agreed that there was no shareholder vote. Setting aside the question of whether Richard had a right to vote on and ratify the transaction, the evidence is undisputed that he did not vote to approve the new shares. A question asking about a vote that never occurred would also be superfluous.

But having found the language unnecessary does not end the inquiry, because we still must consider harm. "An appellate court will not reverse a judgment for a charge error unless that error was harmful[.]" *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). We are tied to that standard by TEX.R.APP.P. 44.1(a)(1) which commands that no judgment may be reversed unless the error "probably caused the rendition of an improper judgment[.]" *Id.* In determining whether an erroneous charge caused an improper judgment, we examine the entire record. *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006); *De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex.App.--El Paso 2000, no pet.)("Our review requires that we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety.").

Here we fail to find harm. First, looking to the charge, the three safe harbors were presented in the disjunctive, meaning that the jury would have had to consider the potential application of all three alternatives. Unless the record shows otherwise, we presume that the jury applied the charge as written. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 n.61 (Tex. 2003)(collecting cases). Looking to the trial testimony, the majority of the witness testimony and exhibits focused on the "fairness" issue. Richard argued that the share price Dick paid for the newly issued stock was too low, and thus the purchase price was unfair to PMI. Dick calculated the purchase price based on "book value" and not "market value." Richard presented testimony criticizing the use of book value. For instance, Bock spent about an hour calculating the stock price based on book value, while a fair market value determination would have taken four to six weeks. Both sides presented voluminous and competing expert testimony about the market value of PMI. They additionally admitted into evidence other fair market valuations as found in estate filings and financial statements.

Another chunk of trial testimony pertained to Richard's second fairness argument. He claimed that the new share issuance caused GST to serve a letter noticing its intent to terminate the Toyota franchise. Richard reasoned that the termination was foreseeable given GST's previous actions taken in 2010 and 2011 when Dick merged two other corporations into PMI without obtaining Toyota's prior consent. Dick also received yearly letters reminding him of the need for preapproval of any ownership change. Richard thus argued the stock issuance placed PMI, Dick Poe Imports, L.P., and the Dick Poe Family Limited Partnership at risk for losing a substantial income generating dealership and caused the dealership to incur substantial attorney's fees in fending off GST's franchise termination.

In contrast, the evidence pertaining to whether Richard had the right to vote on the share issuance was limited. The parties hotly contested *to the trial court* whether PMI's by-laws required shareholder notification or shareholder approval. But by contrast, the testimony *presented before the jury* was limited and brief. And we find no evidence addressing the disinterested director question, other than Sergent's testimony that it does not apply in this case.

Appellants rely on cases like *Timberwalk Apartments, Partners, Inc. v. Cain*, where a trial court erroneously included an instruction wholly inapplicable to the case. 972 S.W.2d 749, 755 (Tex. 1998)(instruction germane to landlord's duty to repair when issue was landlord's duty to prevent personal injury). In finding reversible error, the court there noted that counsel "focused the jury's attention on the instruction and plainly misstated it[.]" *Id.* Conversely, the closing arguments here at best superficially raised the unnecessary charge language. Richard's arguments germane to Question Four mainly focused on the fairness issue, detailing the evidence of GST's efforts to terminate the franchise. He also argued the transaction was not fair to the Chrysler and Dodge dealerships because the people in charge do not know they are doing, resulting in poor sales performance. He further argued that a corporation is run for benefit of its owners, and it was unfair not to tell Richard, its only owner, about the stock issuance.

In contrast, we find only a single instance where the by-laws were argued, with one paragraph dedicated to whether notice is required by the by-laws, and one page of argument on stock transfer restrictions.[11] Dick's closing argument similarly focused on the fairness prong of Question Four and dismissed the two unnecessary prongs because there were no disinterested directors and no shareholder entitled to vote. So unlike *Timberwalk* that involved a wholly inapplicable statute that was then misused in closing argument, the question here contained a law

---

[11] Out of some fifty-five pages of total argument by Richard's counsel.

24

clearly applicable in part, and the irrelevant parts were neither emphasized nor calculated to mislead the jury.

Appellants also urge that the inclusion of the shareholder ratification safe harbor acted as a comment on the evidence, suggesting to the jury that Richard in fact had a right to notice, or right to vote on the stock issuance. Rule 277 prevents the trial court from commenting "directly on the weight of the evidence" but states that an incidental comment is not objectionable. TEX.R.CIV.P. 277. A trial court impermissibly comments on the weight of the evidence by assuming the truth of a materially controverted fact or exaggerating, minimizing or withdrawing pertinent evidence from the jury's consideration. *Redwine v. AAA Life Ins. Co.,* 852 S.W.2d 10, 14 (Tex.App.--Dallas 1993, no writ). In our view, the inclusion of the shareholder validation provision was at best an incidental comment, as it did not dictate how the jury should view the notice or voting provisions in the by-laws.

Principally because there was no harm, we overrule Issue Ten. One subsection of Issue Eleven complains of the failure to submit Appellants' version of the safe harbor question. While we agree Appellants' requested question better framed the issue, we similarly find the failure to submit that question in lieu of Question 4 was harmless error.

### 2. Question Four does not present a pure question of law

In its first issue, Appellants complain that Question Four submits a pure question of law; consequently, the jury's answer is immaterial. Appellants correctly points out that juries decide fact questions and courts decide law questions. *See Chitsey v. National. Lloyds Ins. Co.*, 738 S.W.2d 641, 643 (Tex. 1987)("A jury's role is to decide matters of fact and not matters of law."). And a jury determination of a question of law is immaterial and may be disregarded. *Spencer*, 876 S.W.2d at 157.

25

At first blush, Question Four looks like a question of law because its introductory sentence in fact asks a legal question: "Is the share issuance valid and enforceable under the Texas Business Organizations Code?" What differentiates it from a pure question of law, however, is the instruction in the next sentence of the question: "The share issuance is valid and enforceable if any one of the following conditions is satisfied." The charge then sets out three conditions, one of which includes the fairness inquiry. Neither party disputes that the fairness inquiry is a question of fact. Accordingly, while the first sentence of the question asks for a legal conclusion, the jury could only answer that question by resolving the fact question imbedded in the question: was the share issuance fair to the corporation. As we noted earlier, Question Four contained unnecessary verbiage for disinterested director approval and shareholder ratification. For that matter, the first sentence may have been unnecessary as well.[12] The jury only needed to determine whether the transaction was fair, and we think it necessarily must have done so given the grammatical construction of the question as a whole.

Appellants cite several cases for the proposition that it is error to ask the jury a question of law. We do not question the holdings of those cases, but they are inapposite here. They involve either jury questions asking a pure question of law or one asking about undisputed facts. *See Knutson v. Ripson*, 354 S.W.2d 575, 576 (Tex. 1962)(question asking for effect of acceptance of check was pure legal issue, as distinct from question asking if parties made an agreement); *El Paso Refining, Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 386 (Tex.App.--El Paso 2002, pet. denied)(whether party was an obligor under the usury laws was question of law that the court should have resolved, so jury question on that issue was error, but harmless error); *Hudson Buick,*

---

[12] The flipside of that argument, however, is that both sides had identified and put the text of Section 21.418 before the jury. In questioning Sergent, for instance, one counsel read Section 21.418's definition for what was required of a "valid and enforceable" transaction including the use of that phrase. The first sentence in Question Four might have been no more than an aide to refer the jury back to that testimony.

*Pontiac, GMC Truck Co. v. Gooch*, 7 S.W.3d 191, 196 (Tex.App.--Tyler 1999, pet. denied) (ownership of car became a question of law when none of the relevant facts were disputed); *Alamo Carriage Serv., Inc. v. City of San Antonio*, 768 S.W.2d 937, 942 (Tex.App.--San Antonio 1989, no pet.)(whether permits expired under their own terms should have been decided as a matter of law and jury question on that issue was improper).

A case from our Court points out that juries should receive the law from the trial court but should not be asked to interpret that law. In *Crawford & Co. v. Garcia*, 817 S.W.2d 98, 103 (Tex.App.--El Paso 1991, writ denied) the jury question asked whether the defendants committed "unfair or deceptive acts or practices." Rather than define that term, the trial court merely included three verbatim sections of the Texas Insurance Board regulations, one section of the Texas Worker's Compensation Act, and one rule of the Industrial Accident Board. *Id*. We found that improper because "[w]hile the jury is to receive the law from the court, it is not a recognized procedure for the court to give statutes and rules to a jury for their own interpretation . . . . They were left to make their own interpretation based upon two pages of rules, regulations and statutes." *Id*. The difference here is that Question Four provided a definition of what was required for a valid and enforceable share issuance. No interpretation of the statue was required.

Part of Appellants' argument under this issue harkens back to their claim that the shareholder ratification safe harbor should not have been submitted. Appellants contend that the jury was invited to interpret that safe harbor when in fact it was a question of law for the trial court to decide. This is true, Appellants claim, because the question allowed the jury to "consider all the circumstances surrounding the transactions" in answering the question. But any "interpretation" would fall on the shareholder agreement, and not the statutory enactment. Moreover, as we noted before, the shareholder-ratification presupposes some vote approving the

27

share issuance took place. That never happened, and any error in allowing the jury to interpret that section would be harmless, because at the end of the day, it simply did not apply on these facts.

We conclude that Question Four is not a pure question of law and overrule Issue One.

### 3. The lack of a specific date does not render the jury answer immaterial.

Appellants' second issue argues that Question Four failed to specify the relevant date when the stock issuance was authorized. Appellants maintain that date must be May 1, 2015 when Dick, as the sole director, instructed Sergent to issue the shares. Without a precise date in the question, Appellants fear that the jury might have looked to May 6th as the relevant date--that being the day when Castro obtained Dick's signature on the check for the stock purchase price. Appellants reason the five-day difference significant, because the jury had some conflicting evidence about Dick's mental state on those two dates. On May 1st he was cognizant of several legal and familial issues. On May 6th his handwriting had noticeably regressed.

No doubt, the terms of a contract, statute, or event might make it necessary to recite a critical date in a jury question. In *BP American Production Co. v. Red Deer Resources, LLC*, 526 S.W.3d 389, 398 (Tex. 2017), for instance, the date on which a well was capable of producing in paying quantities was of critical importance. The marginal gas well in that case produced on some days, and other days not. *Id.* at 392. Properly interpreted, the lease language provided a specific date on which the ability to produce in paying quantities should have been determined. *Id.* at 397. The failure of a jury question to inquire about the correct date meant the jury's answer could not sustain the resulting verdict. *Id.* In our case, however, the difference between May 1st and May 6th does not take on the same significance.

28

As we explain above, the relevant fact issue decided by the jury was fairness to the corporation of the stock issuance. Under the statute, the jury would look to the fairness issue on the date the share issuance was "authorized, approved, or ratified" by Dick, as the sole director. Richard's fairness arguments primarily focused on the share price and the consequences of not obtaining GST's preapproval. Whether one looked at the share issuance on May 1st or May 6th, those issues are viewed through the same lens. The Appellants concern over Dick's competence does not touch on the fairness inquiry, other than perhaps suggesting Dick could not have ratified the transaction as late as May 6th. But the trial court directed a verdict on the competence issue, no issue was submitted on it, and Richard never argued in closing any significance to the May 1st or May 6th dates under Question Four. We consequently overrule Issue Two.

### 4. The uncontroverted evidence and answer to Question Four supports the judgment.

Appellants' final attack on Question Four asserts the jury's answer is insufficient to support the verdict. In particular, Appellants assert that the jury only failed to find the stock transaction was fair, which is not the same as an affirmative finding of unfairness. They reason that Richard carried the burden to obtain an affirmative finding on the self-dealing claim, and the jury's failure to find in favor of Appellant's affirmative defense simply will not support the judgment. Rather, Appellants urge that we must render judgment that both sides failed to meet their burden to obtain declaratory relief and dismiss both sides declaratory relief claims (leaving the status quo intact).

The issue is controlled by Rule 279 that in its first sentence commands: "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived." TEX.R.CIV.P. 279. Appellants essentially argue that no element of Richard's self-dealing claim was submitted, and it is therefore waived. Appellants further argue that several cases hold that submitting only an affirmative

defense is not the same submitting an element of the claim. In other words, Richard cannot piggyback off Appellant's submission of the safe harbor defense.

The problem with the argument, however, is that the Rule 279's waiver only applies by its terms to claims that are not "conclusively established under the evidence[.]" *Id.* Submission of an issue on undisputed facts has long been held to be unnecessary. *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971); *Ace Fire Underwriters Ins. Co. v. Simpkins*, 380 S.W.3d 291, 303 (Tex.App.--Fort Worth 2012, no pet.); *St. Paul Ins. Co. v. Rakkar*, 838 S.W.2d 622, 629 (Tex.App.--Dallas 1992 pet. denied); *Corpus Christi Nat. Bank v. Lowry*, 662 S.W.2d 402, 405 (Tex.App.--Corpus Christi 1983, no writ); *James A. Dick Co. v. Yanez*, 55 S.W.2d 600, 603 (Tex.Civ.App.--El Paso 1932, writ ref'd)("If undisputed facts should not be submitted, then it follows that a judgment rendered in the absence of a finding upon such undisputed facts should be upheld.").

And here, the elements of the self-dealing claim were all undisputed. Dick was a director. He was not disinterested, and he materially benefited from the transaction. Both his own lawyer and accountant so testified at trial. The only issue in dispute was whether the transaction was salvageable under one of the safe harbors of Section 21.418. But the burden to make that showing was on Appellants, and not Richard. *Holloway*, 368 S.W.2d at 576; *Torres*, 915 S.W.2d at 49 ("An interested officer seeking to enforce such a transaction against the corporation *has the burden of proving* the utmost fairness and good faith of the transaction, and the courts will scrutinize the transaction closely.), [Emphasis added]. Appellants' counsel correctly conceded to the trial court below that they carried this burden.

Appellants' cited cases to the contrary are unavailing. In *Grenwelge v. Shamrock Reconstructors, Inc.*, 705 S.W.2d 693, 694 (Tex. 1986), it appears that the plaintiff tried to support their affirmative claim for relief by relying on a negative jury finding to an affirmative defense.

30

That a jury rejects an affirmative defense of course does not prove *disputed* elements of a plaintiff's claim. *Id.* at 694 (negative finding to defensive issue on breach of contract would not support proof that plaintiff substantially performed under the same contract). Likewise, in *Castille v. Serv. Datsun, Inc.*, No. 01-16-00082-CV, 2017 WL 3910918, at *6 (Tex.App.--Houston [1st Dist.] Sept. 7, 2017, no pet.)(mem. op.) a negative finding on a jury question asking if one party breached two specific deed restrictions did not support a declaratory judgment that the same party complied with all other deed restrictions.[13]

Appellants suggest that Richard carried the burden to submit and obtain an affirmative finding on the converse of Question Four (i.e., that the share issuance was unfair). We disagree. That would misallocate the burden of proof for fairness, which was squarely on Dick. Nor do Appellants identify any other disputed fact question that needed to be submitted to sustain the self-dealing claim. Because the other facts necessary to the self-dealing claim were undisputed, the trial court did not err in rendering judgment on that claim. We therefore overrule Issue Three.

### B. Confidential Relationship--Questions One and Three

Having reached the conclusion that the jury's answer to Question Four is sufficient to sustain the declaratory relief, we find it unnecessary to resolve those additional issues directed at the jury's answers to Question One and Three. Those issues include: whether the confidential relationship should have been submitted at all (Issue Four and Seven); whether Section 21.418 precludes the application of a confidential relationship as a matter of law (Issue Five); whether the answer to the questions is immaterial because it only asks about actions taken in an individual

---

[13] The other case cited by Appellants is from this Court but involved a misapplication of the burden of proof. *Adams v. Waldrop*, 740 S.W.2d 32, 33 (Tex.App.--El Paso 1987, no pet.). The jury question in that case placed the burden on the wrong party and a negative answer to the question could not support the other party's obligation to make an affirmative showing.

31

capacity (Issue Six); whether legally and factually sufficient evidence supports the findings (Issue Eight); and whether the evidence conclusively establishes that the confidential relationship terminated before the share issuance (Issue Nine). While those issues are substantial, and in some respects raise important questions under Texas law, we need only address those issues that are "necessary to final disposition of the appeal." TEX.R.APP.P. 47.1; *State v. Ninety Thousand Two Hundred Thirty-Five Dollars and No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 294 (Tex. 2013)("It was not necessary for the court of appeals to address Bueno's third ground after it affirmed the summary judgment based on his second ground."). Accordingly, we overrule Issues Four, Five, Six, Seven, Eight and Nine as moot, and without regard to their merits.

## C. Evidentiary Issues

Appellants finally complain in their eleventh issue that the trial court erred in admitting evidence and argument on (a) interpretation of unambiguous corporate by-laws, and (b) issues subject to an administrative law proceeding over forfeiture of the Toyota franchise.

### 1. Standard of Review

The admission or exclusion of evidence rests in the sound discretion of the trial court. *See Interstate Northborough Partnership v. State*, 66 S.W.3d 213, 220 (Tex. 2001). We review a trial court's rulings on the admissibility of evidence for an abuse of discretion. *Loera v. Fuentes*, 511 S.W.3d 761, 771 (Tex.App.--El Paso 2016, no pet.). A party complaining about incorrectly admitted evidence carries the burden to show that the erroneous admission of the evidence probably caused the rendition of an improper judgment. TEX.R.APP.P. 44.1(a)(1). As part of that inquiry, we must review the entire record, "considering the state of the evidence, the strength and weakness of the case, and the verdict." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008)(internal quotation marks and citation omitted). They must show the

32

erroneously admitted evidence was "crucial to a key issue" and if so, that error was likely harmful. *Id.* at 873. "By contrast, admission or exclusion is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference." *Id.* The standard "is more a matter of judgment than precise measurement." *Id.*, *quoting Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

### 2. GST's Notice of Franchise Termination and the ensuing administrative proceeding

As we allude to earlier, the jury heard extensive evidence about GST's efforts to terminate the Toyota franchise, and the initiation of an administrative proceeding challenging that action. Any change of ownership, as defined by the dealership agreement, required GST's pre-approval. GST's vice president considered the share issuance a "change of ownership" contemplated by the dealership agreement. She testified that the change in control because of the share issuance was the primary reason for the GST's termination decision. Sergent agreed that GST's interpretation of contract's requirement for pre-approval of ownership changes was one of the reasons for the termination, though GST had other reasons as well. Richard presented the jury with both exhibits and testimony documenting GST's actions, the substantial sums expended to resist the termination, and the potential loss to PMI and the other limited partnerships if the franchise was lost.

Appellants first contend the evidence was irrelevant, and thus inadmissible as a simple matter of timing. They posit that under Question Four, the issue of fairness must be considered at the time the transaction is authorized, and not some time in the future. The share issuance was authorized on May 1, 2015 and the events surrounding the dealership termination began with GST's September 2015 notice of intent to terminate. In support of their argument, Appellants advance the hypothetical of a director who authorizes a land sale on a particular day and at a particular price, and sometime later the land is discovered to be worth considerably more because

33

of an unforeseen circumstance.  In that case, it would be improper to judge the fairness of the transaction on any date other than the day it was authorized.  We agree, but the key to the hypothetical is that the latter event making the land more valuable was unforeseen.  In this case, Richard offered some evidence that Dick knew or should have known that GST would consider the stock issuance as a change of ownership transaction.  In 2010 and 2011, two of Dick's other corporations were merged into PMI.  After the first merger, GST objected and served a letter objecting to the transaction.  Sergent agreed that GST was displeased that the transaction was completed without its prior approval. Richard also argues, and we agree, that the jury could have drawn an inference from the manner of Sergent's presentation of the issue to GST that he knew Dick was taking a risk.  GST was first notified *after* the share issuance but was not told it had already occurred.  The letters were written to suggest the transaction was to occur later, and GST's vice president apparently drew the same conclusion from a phone conversation she had with Sergent.  If it was foreseeable that GST would consider the share issuance a breach of the dealer franchise agreement, whether GST was ultimately correct or not, it was foreseeable that adverse consequences could flow from a share issuance taken without GST's consent.  Though the evidence was disputed (and thus for the jury to decide), those consequences were all valid considerations to the fairness determination.

The cases Appellants rely on are inapposite.  They stand for the proposition that irrelevant evidence of post-event actions can taint a jury.  We do not doubt that is true.  *See Lawrence v. Latch*, 431 S.W.2d 307, 310 (Tex. 1968)(in suit over existence of agreement pertaining to a will, evidence of post-will events was irrelevant, and in that case caused reversible error); *Brookshire Bros., Inc. v. Lewis*, 911 S.W.2d 791, 796 (Tex.App.--Tyler 1995, pet. denied)(admission of evidence of subsequent remedial measure that did not meet the applicable rule of evidence resulted

34

in reversible error). Along the same line is *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 147 (Tex. 2004) where the court held admission of a large number of incidents of other claimed product failures, many which had nothing to do with the issue in the case, was error. The difference here is that evidence of the franchise termination was relevant to the fairness issue. It was no doubt prejudicial to Appellants, otherwise Richard would not have urged its admission. But no claim is urged that it is "unfairly prejudicial" in the sense of a TEX.R.EVID. 403 challenge.

Appellants also urge that the evidence intrudes on the exclusive jurisdiction of the Texas Motor Vehicle Board that is vested with the exclusive jurisdiction to decide dealer franchise terminations. We agree with Richard, however, that the jury was not asked to decide the merits of GST's termination decision. In fact, the jury was told that the administrative proceeding was about to be settled without any official determination of the merits of GST's actions. The only point of the evidence was that the share issuance risked GST taking the position that it did, and thus leading to an administrative hearing that cost the dealership substantial sums in legal fees and placed the franchise in jeopardy. We overrule Issue Eleven, parts (i)-(iii).

### 3. Interpretation of the by-laws

Appellant's other evidentiary challenge pertains to argument and evidence about the by-laws, and specifically whether Richard could interpret what Appellants contend are unambiguous provisions. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd*., 940 S.W.2d 587, 591 n.2 (Tex. 1996)(noting it would be improper to utilize testimony to create an ambiguity in an otherwise unambiguous contract). But the only testimony that Appellants identify in their brief as objectionable is as follows:

> [COUNSEL]: Would you read into the record Section 7, the introductory words and little section b is the one I care about.
>
> [RICHARD]: Okay. 'Section 7. Secretary. The Secretary shall: (a) keep the minutes of the shareholders' and the Board of Directors' meetings in one or more books

35

provided for that purpose; and (b) see that all notices are duly given in accordance with the provisions of these bylaws or as required by law.'

[COUNSEL]: Sir, who was the secretary of Poe Management, Inc.?

[RICHARD]: The secretary of Poe Management, Inc., was, I believe, Paul Sergent.

[COUNSEL]: And did you receive any notice in connection with the share issuance?

[RICHARD]: No, I did not.

[COUNSEL]: Any notice from Mr. Sergent?

[RICHARD]: No.

Appellants then suggest that from this testimony, Richard was able in closing to argue that he was entitled to notice under PMI's organic documents, when in fact those documents unambiguously do not provide that right. Our first problem with Appellant's argument is that the complained of testimony did not have the witness interpret the by-laws. Instead, Richard merely read one provision of the by-laws, and then stated as a factual matter that he never received any notice of the stock issuance. The second problem with the argument is that while Richard argued in closing he was never given any notice of the stock issuance, his argument was made under the umbrella of the fairness issue in Question Four, or the fiduciary duty that Dick may have owed under Questions One and Three. They were not exclusively argued as some violation of the corporate by-laws. Richard's argument was mainly premised on the theme that a corporation is run for the benefit of its owners, and that as a matter of fairness, the only owner was entitled to notice of such a large share issuance. To the extent that Richard referenced the by-laws, his argument certainly did not turn on the limited testimony identified as the basis of this issue. We overrule Issue Eleven, part iv.

## IV.  RICHARD'S CROSS-APPEAL

Richard perfected his own appeal complaining about (1) the directed verdict granted in the phase-two-trial, (2) the judgment language requiring PMI to reimburse Dick's estate for the

canceled stock sale, and (3) the reduction in his claim for attorney's fees. We take those issues in order.

## A. Directed Verdict on Individual Liability Claims

During the phase-two-trial, Richard limited his suit to claims against Sergent, Bock, and Castro individually, and he disclaimed any recovery from Dick's estate. He pursued two avenues for recovery against the individual defendants: 1) breach of their fiduciary duty to PMI, and 2) a conspiracy to cause the stock issuance.

### 1. The Motion and the Ruling.

At the conclusion of Richard's case, the individual defendants moved for a directed verdict claiming Richard produced: (1) no evidence of a breach of the fiduciary duty of due care because he never overcame the business judgment rule with respect to any actions they took as corporate officers and directors; (2) no evidence that Bock, Castro, or Sergent performed any overt act that they knew was in connection with an unlawful act on the part of Dick in effectuating the share issuance; (3) Sergent cannot be liable for actions as an attorney giving legal advice to a client; and (4) with no actual damages, Richard cannot prove an actionable conspiracy. Without specifying the reason, the trial court granted the instructed verdict and discharged the jury.

### 2. Standard of Review.

A party is entitled to a directed verdict if no evidence of probative force raises a fact issue on the material questions in the suit, or the evidence established a claim or defense as a matter of law. *Prudential Ins. Co. of Am. v. Financial Review Services, Inc*., 29 S.W.3d 74, 77 (Tex. 2000); *Thompson v. Stolar*, 458 S.W.3d 46, 63 (Tex.App.--El Paso 2014, no pet.). In reviewing a directed verdict, we must credit evidence favorable to the non-movant if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168

37

S.W.3d 802, 827 (Tex. 2005); *Stolar*, 458 S.W.3d at 63. We also consider the evidence in the light most favorable to the non-movant, discarding all contrary evidence and inferences. *Moreno v. Texas Dept. of Transp.*, 440 S.W.3d 889, 894 (Tex.App.--El Paso 2013, pet. denied). If we determine that any conflicting evidence of probative value raises a material fact issue on any theory of recovery, then the directed verdict is improper because such an issue is for the jury to resolve. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

### 3. *The Fiduciary Duty Claims*

Richard's live pleading in paragraph 121 generally asserts that Bock, Castro, and Sergent breached their fiduciary duties as officers and directors of PMI. Corporate officers and directors owe three distinct duties to the corporations they serve: obedience, loyalty, and due care. *Gearhart Industries, Inc. v. Smith Intern., Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)(interpreting Texas law). The duty of obedience requires a director to avoid acting beyond the scope of their enumerated powers (also referred to as *ultra vires* acts). *Id.* The duty of loyalty requires that that a director act in good faith and not allow his or her personal interests to prevail over the interests of the corporation (also referred to a self-dealing). *Id.* And finally, the duty of care "requires a director to be diligent and prudent in managing the corporation's affairs." *Id.*

The duty of care, the breach of which is sometime referred to as mismanagement in our record, is subject to the business judgment rule. "The business judgment rule in Texas generally protects corporate officers and directors, who owe fiduciary duties to the corporation, from liability for acts that are within the honest exercise of their business judgment and discretion." *Sneed v. Webre*, 465 S.W.3d 169, 173 (Tex. 2015), *citing Cates v. Sparkman*, 11 S.W. 846, 848-49 (1889). The rule protects corporate officers and directors from being held liable to the corporation based on actions that are "negligent, unwise, inexpedient, or imprudent if the actions were 'within the

38

exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved.'" *Sneed*, 465 S.W.3d at 178, *quoting Cates*, 11 S.W. at 849.

The individual defendants moved for directed verdict arguing that Richard failed to overcome the business judgment for any of the actions they took as officers or directors of PMI. In part, Richard responds on appeal that the business judgment rule is an affirmative defense. And by definition, the individual defendants would carry the burden to prove an affirmative defense. *See Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 485 (Tex. 2016)(noting that an affirmative defense places the burden of proof on the defendant to present sufficient evidence to establish the defense and obtain the requisite jury findings). The allocation of that burden is critical to the standard of review as it dictates whether Richard had to disprove the defense, or the individual defendants had to prove it as a matter of law. So, we take a short detour from substantive corporate law into the procedural implications of the business judgment rule.

### (a) Who carries the burden to prove or disprove application of the business judgment rule?

Looking to Texas authority, the business judgment rule has been referred to as a "defense," but we find no case holding that it is an "affirmative defense" under TEX.R.CIV.P. 94. *See Sneed*, 465 S.W.3d at 178-79)("Second, the business judgment rule applies *as a defense* to the merits of a shareholder's derivative lawsuit that asserts claims against the corporation's officers or directors for breach of duties that result in injury to the corporation.")(emphasis added); *Gearhart Industries, Inc.*, 741 F.2d at 721 ("This principle is known as the business judgment rule and it is a *defense* to accusations of breach of the duty of care.")(emphasis added), *citing*, Michele Ubelaker, *Director Liability Under the Business Judgment Rule: Fact or Fiction?,* 35 Sw.L.J. 775, 790 (1981). Some federal authority, however, has referred to the business judgment rule as an affirmative defense in applying FED.R.CIV.P. 8(c). *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d

Cir. 2005); *F.D.I.C. v. Niblo*, 821 F.Supp. 441, 458 (N.D. Tex. 1993)("The business judgment rule is an affirmative defense within the meaning of Rule 8(c).").

Under Delaware authority, the business judgment rule acts as a presumption that the plaintiff must overcome. *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009). Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption, and the failure to do so insulates corporate decisions that in hindsight turned out poorly or caused the company to suffer loss. *Id.* When the business judgment rule acts as a presumption that a plaintiff must overcome, it no doubt functions as a defense, but is not procedurally an affirmative defense. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 679 (N.D. Tex. 2011)("Thus, describing the presumption created by the business judgment rule as an affirmative defense is, at best, a dubious characterization of the rule.").[14]

A series of Texas federal district courts, applying their view of Texas law, concluded that overcoming the business judgment rule was an element of the plaintiff's case. In *FDIC v. Benson,* 867 F.Supp. 512 (S.D. Tex. 1994), the court wrote that "the Texas business judgment rule does not function simply as a defense to claims of negligence or breach of fiduciary duty by corporate directors." *Id.* at 521, *citing F.D.I.C. v. Brown*, 812 F.Supp. 722, 724 (S.D. Tex. 1992). Rather, it was a "substantive rule of law that requires of the FDIC both pleading and proof to avoid its reach." *Benson*, 867 F.Supp. at 521. A court from the Western District of Texas adopted the same view in *F.D.I.C. v. Schreiner*, 892 F.Supp. 869, 881 (W.D. Tex. 1995).

---

[14] Texas and Delaware corporate law do not, however, precisely overlap on the fiduciary duties owed by officers and directors. *See* Byron F. Egan, *Fiduciary Duties of Corporate Directors and Officers in Texas*, 43 Tex. J. Bus. L. 45, 58 (Spring 2009)(discussing and contrasting both Texas and Delaware law). But "Texas courts often look to Delaware law for guidance on business issues, given the specialized nature of Delaware courts considering business disputes." George Parker Young, Vincent P. Circelli, Kelli L. Walter, *Fiduciary Duties and Minority Shareholder Oppression from the Defense Perspective: Differing Approaches in Texas, Delaware, and Nevada*, 45 Tex. J. Bus. L. 257, 260 n.1 (Fall 2013)(collecting cases supporting this proposition).

These authorities are persuasive but not controlling. Richard contends the more recent reference in *Sneed v. Webre* should prevail, but again, the court did not hold the business judgment was an "affirmative defense," nor was that the issue before the court. Rather, the court observed that in shareholder derivative litigation the business judgment rule could arise twice, once with the corporation's decision not to pursue a claim in its own name, and again when the merits of the underlying claim are decided. 465 S.W.3d at 178. *Sneed* holds that the statutory framework governing shareholder derivative claims for closed corporations precludes consideration of the business judgment rule at that first stage. The court stated:

> Quite simply, by virtue of Article 5.14, the Legislature codified a shareholder's right to bring a derivative proceeding on behalf of a closely held corporation. In doing so, the Legislature did not require shareholders of a closely held corporation to establish derivative standing by pleading or proving that the directors failed to exercise their honest business judgment in not pursuing the corporate cause of action.)(internal citation omitted).

*Id*. at 183. But *Sneed* also reaffirms that the business judgment rule still applies to closed corporations, and more particularly to the determination of the merits of a claim. *Id.* at 179. We find it significant that the court wrote as to the merits stage that it would be "insufficient" for a shareholder to merely allege mismanagement or neglect or an abuse of discretion in conducting the affairs of the corporation. *Id.* at 187. That kind of bare allegation could, in the court's view, be met with a special exception, which suggests that a plaintiff carries the burden the on merits to plead (and then of course to prove) something more. *Id*. And as to the merits of the case, the court termed the business judgment rule's formulation from prior Texas cases "as pertaining to what a shareholder plaintiff must plead and prove to establish a derivative right to relief on behalf of the closely held corporation[.]" *Id.*

Here, we are at the merits stage of the claim. There was no question that the individual defendants raised the application of the business judgment rule--they pleaded the matter, moved

41

for summary judgment on the business judgment rule, raised it expressly to the jury in opening argument, and expressly questioned a witness over the doctrine. To best give effect to the policy rationale underpinning the business judgment rule, we conclude that it was part of Richard's case to disprove the business judgment rule. Thus, on directed verdict, Richard carried the burden of showing the corporate actions of which he complains were not protected by the rule.

### (b) Richard failed to overcome the business judgment rule as to any mismanagement claim.

Germane to the mismanagement claim, Richard presented evidence that Bock and Castro through PMI entrusted the management of the two dealerships to three individuals. They retained Gery Reckelbus as general manager of Dick Poe Chrysler and he was nominated as the Dealer Principal for both dealerships. He had been hired by Dick some fifteen years earlier. Joe Mailander was retained as general manager of Dick Poe Dodge. Dick had originally hired Mailander for that post some eight years earlier. Finally, Bock and Castro hired John Attel to manage the body shop and parts departments for both dealerships, and later promoted him to general manager for Dick Poe Chrysler. While Attel had been disqualified and then discharged from the general manager slot at Dick Poe Toyota, Chrysler approved him as a general manager.

Castro continued to work as the comptroller for the Chrysler and Dodge dealerships, but she also served as an officer of PMI. Along with Bock, they both conceded that they lacked the ability to manage every day-to-day function of the dealerships. Instead, they relied on Attel, Mailander, and Reckelbus for that expertise, noting all three were approved by Chrysler and had been hired by Dick. They met with the senior managers and reviewed the financials on a monthly basis.

In the phase-two-trial, Richard called an economist, David Bones, who testified that in the years leading up to the share issuance and change of control for the Chrysler and Dodge

42

dealerships, both dealerships experienced significant growth. At the time of or very soon after the share issuance, however, both dealerships experienced a significant decline in financial performance both in revenues and earnings. Bones quantified the loss at the Dodge and Chrysler dealerships at approximately $1 million, which represented the cumulation of lost profits over several years. He concluded the decline could not be explained by outside market forces and stated "[t]here are things happening within the dealership[s] that is causing this decline." The only business practice he identified, however, was a dealership decision to sell more used cars at auction, rather than at wholesale. The only business practice that Richard evidenced at trial through other witnesses was a decision to pay a bonus to all dealership employees in 2016, and the change to a new dealer management software system.

None of this testimony overcomes the business judgment rule. Two of the specific business practices--the change in how used cars were sold and the migration to a new management software--were so cursorily described that no rationale jury could have concluded the basis for the decision violated the business judgment rule. The decision to grant a one-time bonus to employees in 2016 was only slightly better explained. Castro testified that to keep up morale, management took $250,000--the identical sum that had previously been paid to Dick as a salary--and placed it into a bonus pool that was paid out based on years of service. The only criticism that Richard raised to the bonus was that it was unique--the dealerships had never paid a bonus in the past. That fact, however, is less than a scintilla of evidence in attempting to overcome the business judgment rule.

Additionally, Richard complains that Bock and Castro, lacking the expertise to run the dealerships themselves, simply turned them over to others, including John Attel who had been disapproved by Toyota to manage a Toyota dealership. Bound up within the duty of care is the obligation to actually manage the affairs to the corporation. *Resolution Trust Corp. v. Acton*, 844

43

F.Supp. 307, 314 (N.D. Tex. 1994), *aff'd,* 49 F.3d 1086 (5th Cir. 1995)(citing authority for proposition that the business judgment rule does not "protect officers and directors who abdicate their responsibilities and fail to exercise any judgment."). Yet we do not read into that duty the obligation to micromanage corporate affairs. Good corporate boards often rely on skilled employees to handle day-to-day operating decisions. Nothing suggests that Bock and Castro did not do that here. They continued the employment of two long-time managers at the Dodge and Chrysler dealerships, both of which Dick had originally hired. Sergent explained they did so to keep a continuity of experienced management who had relationships with the employees. They retained John Attel and initially placed him in charge of the parts and service departments of the dealerships. No witness criticized, or even specifically analyzed the profitability of those departments. Attel was later promoted to general manager, but with the approval of Chrysler. Finally, the board regularly met with management, and reviewed financials. We find no evidence of the breach of the duty of care in this record and the directed verdict was properly granted on that claim.

### (c) Richard produced some evidence of a self-dealing claim.

But we must reach a different conclusion as to a duty of loyalty (self-dealing) claim that Richard urges. His live petition generally asserts a breach of fiduciary duty claims against Bock, Castro, and Sergent. No special exceptions were urged to delineate which of the three fiduciary duties (obedience, loyalty, or care) that allegation raised. In response to the motion for directed verdict, Richard specifically claimed he was seeking disgorgement from the individual defendants. He also argued that each individual defendant made decisions that personally benefited themselves financially to the detriment of the company. On appeal, he contends that that probate court erred in dismissing a self-dealing claim based on Bock and Sergent billing PMI and the businesses it

44

controlled for accounting and legal services. He also asserts the viability of a claim for Castro receiving a raise.

The individual defendants first respond that Richard's live pleading does not contain any *factual* allegation that could be interpreted as a self-dealing claim. We must disagree. Paragraph 46 of the Petition asserts:

> As the Executors of the Estate, Bock and Castro gained unfettered control of Dick's businesses, including PMI, via the purported self-dealing stock transaction that occurred just before Dick's death. Since then, Sergent has served as an attorney for these businesses and the Estate, and Bock has served as an accountant for these businesses and the Estate, and each have been paid enormous and undeserved fees by the Estate directly or through those businesses.

The pleading does not specifically reference Castro's raise and bonus. Richard claims, however, there was enough evidence on the issue admitted by both side such that Castro's issue was tried by consent. *See Phillips v. Phillips*, 296 S.W.3d 656, 670 (Tex.App.--El Paso 2009, pet. denied)("To determine whether the issue was tried by consent, the court must examine the record not for evidence of the issue, but rather for evidence of *trial* of the issue."). One predicate for trial by consent, however, is that a party seeks and trial court grants an amendment to the pleadings. *See* TEX.R.CIV.P. 63; *Whole Foods Market Southwest, L.P. v. Tijerina*, 979 S.W.2d 768, 776 (Tex.App.--Houston [14th Dist.] 1998, pet. denied). We find no such request or ruling below.

Turning to the merits, we conclude that although the evidence is disputed, a self-dealing claim as to Bock and Sergent should have been heard by the jury.

Sergent was Dick's long-time attorney and provided legal services to Dick individually, PMI, and the various limited partnerships. Since Dick's death, Sergent continued to provide legal services to some of the entities, including the Chrysler and Dodge dealerships. From Dick's date of death up to the phase-two-trial, Sergent had billed those entities $19,697.52.

Bock has not charged PMI anything for the time he has spent as its officer. His accounting firm, however, has continued to do work for the Dodge and Chrysler dealerships, and had billed $74,408.85 work for work following Dick's death. He notes, however, that because of his present position with the estate, his firm has recused itself from the previous auditing work that it did for Dick, which was about a third of its Poe related work.

Officers or directors self-deal when they make a personal profit from a transaction by dealing with the corporation. *Gearhart*, 741 F.2d at 719-20. The burden of proof is on the interested officer or director to show that the action under consideration is fair to the corporation. *Id*.; *Holloway*, 368 S.W.2d at 576. As interested director transactions, each of the billings for professional services we note above might well be justified as fair to the corporation. The rates charged may have been appropriate for the service rendered. The burden of fairness, however, fell on the interested directors and not Richard. Just as Richard failed to explain the business decisions in sufficient detail for us to conclude there was some evidence of a violation of the business judgment rule, the record is similarly limited, or at least conflicting, on the fairness issue for these billings. We therefore remand the claims for disgorgement under the fiduciary duty of loyalty claim as to Bock and Sergent.

And even had the pleadings supported a similar claim against Castro, we would view that claim a bit differently. She worked for the dealerships as their comptroller before Dick's death and continued in that role for the Dodge and Chrysler dealerships. Castro earned a base salary and percentage of the dealerships' earnings. In July of 2016, she received a salary increase in her base salary of $800 per month, and her percentage was increased from 1 to 1.5%.[15] Bock, Sergent, and

---

[15] In producing documents between phase-one and phase-two trials, she discovered that her salary had been incorrectly calculated resulting in an overpayment of $2,300 per month. The aggregate overpayment totaled $37,000 which she testified she would return. Richard raises no issue regarding the overpayment and we do not include it in our calculus, assuming that she made good on her testimonial promise to reimburse the dealership.

the dealership's general manager approved that increase. The raise was part of a new salary plan for all the sales, office, and general managers, whose pay had not been changed in some ten years. Her last pay raise had been four or five years earlier. She did not participate in the decision to get the raise, and it was approved by the other two officers of the corporation (along with the general manager of the dealership). Richard points to no evidence that the raise was undeserved or unfair. The directed verdict as to any duty of loyalty claim for Castro was appropriate.

## B. Conspiracy

The other part of Richard's claim focused on an alleged conspiracy between Bock, Castro, Sergent, and Dick to issue the new stock and take control of PMI away from Richard.

### (1) *Controlling Law*

On his conspiracy claim, Richard needed to present some evidence on each of the following five elements: (1) a combination of two or more persons; (2) who sought to accomplish an object or course of action; (3) each person reached a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts were taken in pursuance of the object or course of action; and (5) damages occur as a proximate result. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017); *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). These elements could be shown through circumstantial evidence. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968); *Holloway,* 368 S.W.2d at 581. "A conspiracy may be proven as well by the acts of the conspirators, as by anything they may say, touching what they intended to do." *Id., quoting Whitmore v. Allen*, 33 Tex. 355 (1870). Inferences of concerted action may be drawn from joint participation in the transactions and from "enjoyment of the fruits of the transactions." *Id*

Most of the above elements are not seriously contested. Bock, Castro, and Sergent were all aware of the stock issuance, and each took affirmative steps to help effectuate it, such as drafting corporate documents, calculating the stock price, or securing the method of payment. They did so at a time when Dick was likely unable to arrange those matters himself. And the stock issuance ultimately caused some claimed injury to Richard. Rather, the individual defendants here focus on the third and fourth elements--a meeting of the minds on an object or course of action that involves one or more unlawful, overt acts taken in pursuance of the object or course of action. Or as otherwise stated, an actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means. *Parker*, 514 S.W.3d at 222. The participants must have a meeting of the minds on the object or the course of action. *Id.*

Civil conspiracy is a derivative tort because a defendant's liability depends upon its participation in some underlying tort for which the plaintiff seeks to hold the defendant liable. *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996). Breach of a fiduciary duty is one of the underlying unlawful, overt acts, upon which a cause of action for conspiracy may be based. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."); *Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tex.App.--Texarkana 2000, pet. denied)("Types of torts or unlawful acts on which a cause of action for conspiracy may be based include breach of a fiduciary duty and fraud[.]"). And the jury found the breach of two fiduciary duties in the phase-one-trial: the self-dealing claim from Question Four, and the duties flowing from the confidential relationship as found in Questions One and Three.

48

Richard's burden, therefore, was to show that each alleged conspirator agreed to either (1) breach the fiduciary duties running from Dick to Richard as imposed by the confidential relationship (thus accomplishing an unlawful purpose) or (2) accomplish the lawful purpose of buying stock, but through an improper self-dealing transaction (an unlawful means). We reject the suggestion that merely having knowledge that the transaction would injure Richard is sufficient to support the conspiracy. Many transactions have intended winners and losers.[16] It is only the unlawfulness of end result, or the unlawfulness of the means to accomplish an ordinary purpose, that elevates an action to a civil conspiracy. *Parker*, 514 S.W.3d at 222. And standing by itself, it was not unlawful to divest Richard of control of PMI by issuing and selling additional shares. There was no shareholders agreement preventing it. The by-laws authorized up to 10,000 shares and only 1,000 were held by Richard. No corporate document stated that Richard was to be the only owner. If the stock issuance upset Dick's estate plan, it was Dick's estate plan to upset. And Texas law does not generally create duties running from the corporate officers to the shareholders. *See Ritchie v. Rupe,* 443 S.W.3d 856, 890 (Tex. 2014)("We have not previously recognized a formal fiduciary duty to individual shareholders, and we believe that better judgment counsels against doing so."). Simply having knowledge that the share issuance had a negative impact on Richard is not enough. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)(holding that rejection of a settlement proposal, which is not an unlawful act in itself, did not support conspiracy claim). We thus scour the record for each individual defendant's: 1) knowledge of a breach of the confidential relationship (and appreciation there was such a relationship); or 2)

---

[16] A football team works in concert each week to win its next game, thereby inflicting a loss on its opponent. That hardly rises to the level of an actionable conspiracy, unless perhaps, the team knows its strategy involved something untoward, like stealing the other side's play-book, or selectively deflating the footballs. Or a car dealership's management team works in concert on an advertising plan to steer customers away from its competition, and into its own dealership doors. That action is intended to take something away from the competitors down the street. Nonetheless, it is not actionable unless there is some unlawful action, like the intentional use of false advertising.

knowledge that Dick undertook an unlawful self-dealing transaction to accomplish an otherwise lawful stock purchase.

### (2) Karen Castro

Castro was first employed by Dick as a payroll clerk in 2001 and over the years rose to the comptroller position for the three dealerships. On April 3, 2015, Dick elected her a vice-president of PMI. She understood the appointment was to allow her to sign renewals of leases for a shopping center. She also testified that she did not know about corporate fiduciary duties until after Dick's death. She testified she did not know about the PMI's ownership structure, saying only that it was "very complicated." She admitted to overhearing conversations in 2014 about the share issuance and control but testified "I had no idea what they were talking about" because she always thought Dick was the owner. She observed that Richard was not involved in the dealerships, a fact he did not dispute.[17]

We conclude there was no evidence from which a jury could have concluded that Castro appreciated the existence of, and then the breach of a fiduciary duty arising from a confidential relationship. Richard's most full throated defense of the jury's finding as to that duty focuses on evidence showing: (1) that PMI was formed for the benefit of Richard; (2) Richard executed documents on a yearly basis giving Dick control over PMI; (3) PMI managed the Toyota dealership in which Dick had no ownership interest; and (4) Dick continued to show his trust in Richard by executing guardianship paperwork in February of 2015 that could have allowed Richard to oversee Dick's care. We do not find evidence that Castro had knowledge of any of these matters, nor the background to have appreciated their legal significance. For much the same reason, we find no

---

[17] We state this evidence only as a backdrop, because under our standard of review, it is the evidence that might have supported the claim that controls.

evidence in the record showing that Castro appreciated that the stock purchase was a self-dealing transaction involving a breach of loyalty by Dick to PMI. The directed verdict on the conspiracy claim against Castro is affirmed.[18]

### (3) Anthony Bock

Bock's firm has done work for the Poes since the late 1960s; he joined the firm in 1984. Bock worked for Dick close to 30 years and for Richard some 20 years. He prepared audited financials and the tax returns for all three dealerships, as well as doing Dick and Richard's personal tax returns.

Bock was aware of the discussions about the possible share issuance since at least September of 2014. He did not inform Richard of the share issuance until two days after Dick's death. Though Richard was also a client, Bock concluded his professional ethics prevented him from informing Richard. He agreed that in a true conflict situation, he should withdraw from both clients' representation. Without agreeing to the legal implications, he acknowledged that the stock purchase was a "self-dealing" transaction. He agreed that PMI did not need the infusion of the $3.2 million purchase price, which Richard claims raises an inference there was no business purpose for the transaction. Bock did offer the explanation that the transaction helped to avoid franchise and estate tax liability.

We agree that Bock would have no reason to suspect that the stock issuance breached a fiduciary duty from Dick to Richard based on the informal confidential relationship. After all, that duty was not recognized until a jury concluded it existed following the phase-one-trial. Bock was

---

[18] The most damaging testimony we find as to Castro relates to a communication she received from Chrysler after Dick's death asking for Richard's email address. She forwarded the communication to Bock, Sergent, and her lawyer seeking advice on how to respond. On the lawyer's and Bock's suggestion, she made herself the point of contact, but later provided Richard's contact information to Chrysler. Even viewing this evidence in the light most favorable to Richard, it simply does not provide an inference that Castro knew Dick breached any fiduciary duty to PMI or Richard.

never shown to have knowledge of a confidential fiduciary duty, or many of the facts Richard used to establish it. While he likely did know the ownership interests of the various corporate entities, he did not know the terms of the by-laws as they related to new share issuance. Before Dick's death, he had no active involvement in PMI. He would not have been privy to all of Dick and Richard's conversations about succession plans, or the guardianship. He never professed to have expertise in fiduciary duties outside of the tax laws. He was also told that Dick had a legal right to issue the shares.

We also conclude that there is no evidence Bock would have appreciated the stock issuance was a self-dealing transaction that violated Dick's fiduciary duty to PMI. He understood that Dick benefited from the transaction in the sense he became an owner of PMI. He also understood it gave Dick a controlling interest. But that is not the same thing as knowing it is a breach of a fiduciary duty to the corporation. With regard to the stock issuance, Bock's role was to calculate the book value of the transaction, but he did so based on Sergent's direction to use book value. The most that can really be said is that Bock struggled with his own ethical duty to make disclosures to Richard, who was also a client. That professional obligation, however, is not the same as Dick's fiduciary duty of loyalty to PMI. The probate court did not err by instructing a verdict for Bock on the conspiracy count.

### *(4) Paul Sergent*

Sergeant was Dick's lawyer for 19 years. He was also the lawyer for PMI, and the five limited partnerships. Sergent prepared the corporate documents for PMI, the limited partnership agreements, and the written consents. He acknowledged giving Dick legal the advice on the share issuance.

Whatever doubts we may have as to whether Sergent would have appreciated the existence of a confidential relationship, Sergent testified at trial that the stock issuance was a self-dealing transaction. He acknowledged that as a fiduciary to PMI, Dick had a duty to put its interests above those of himself. And while Sergent may well have believed the safe harbors of Section 21.418 may have applied, that was a fact question for the jury. The manner and timing of Sergent's communications with GST at least raise an inference he recognized some risk that GST might react adversely to *post facto* news of the stock issuance. An adverse reaction by GST made the fairness question at least disputable.

The trial court erred in granting the directed verdict as to Sergent.[19]

## C. Return of the Stock Purchase Price

Richard's second cross-point complains that the judgment requires PMI to return to Dick's estate the $3,209,205 that Dick paid for the share issuance. Bock and Castro as the executors of the estate did not plead for reimbursement of the sum, but the issue apparently came up in a hearing on entry of judgment. They then moved for leave to amend their answer, and argued that in any event, the probate court under its equitable powers had the right to make the award, citing *Johnson v. Cherry*, 726 S.W.2d 4 (Tex. 1987). The probate court never ruled on the motion for leave, but based on the *Cherry* case, directed that PMI repay $3,209,205 to the estate. In *Cherry*, the court upheld a trial court's rescission of a mortgage improperly taken out on homestead property. *Id.* at 6-7. It also held, however, that the same court's equitable powers permitted it to enter a judgment making the homeowner liable for the amount of the unpaid loan upon which the improper mortgage

___

[19] One of the grounds for the directed verdict argued that Sergent's legal advice on how to effectuate the transaction cannot impose civil liability on him. That argument raises the issue of an attorney's immunity. *See Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015)("Texas common law is well settled that an attorney does not owe a professional duty of care to third parties who are damaged by the attorney's negligent representation of a client."). Attorney immunity, however, is an affirmative defense that must be raised by the pleadings. We express no opinion on how attorney immunity might apply if on retrial if it is properly raised.

was based.  *Id*. at 7-8.  Because that amount had not been fixed, the case was remanded to determine the reimbursement amount.  *Id.*

Citing *State v. Morales*, 869 S.W.2d 941, 942 (Tex. 1994), Richard urges that the probate court's equity powers are limited by "the rule of law."  And true enough, a court's equity powers are not unlimited.  *Morales*, for instance, discusses the limitations on a civil court enjoining a criminal statute.  But as we understand Richard's specific claim, he complains that there was no pleading which supports a reimbursement claim, and that the award acts a surprise which prejudiced him.  In particular, he argues that with discovery, PMI might have developed potential offsets to the $3,209,205.  As an example, he notes that PMI paid the Appellants' legal fees in this litigation and that amount could serve as an offset.

We review a trial court's exercise of its equitable authority under an abuse of discretion standard.  *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428-29 (Tex. 2008)(reviewing reimbursement for drilling costs); *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988) (review of marital equitable reimbursement claim).  In matters of equity, we find an abuse of discretion only if the trial court ruled:  (1) arbitrarily, unreasonably, or without regard to guiding legal principles; or (2) without supporting evidence.  *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

We find no abuse of discretion here.  As to Appellant's claim that there was no pleading to support reimbursement, *Cherry* expressly rejected that claim.  726 S.W.2d at 8.  It did so because when a party seeks rescission of an instrument, they usually carry to burden to plead a willingness to repay the underlying consideration.  *Id*. ("Restoration or an offer to restore consideration received by one seeking to cancel a deed is a condition precedent to maintaining a suit for cancellation of an instrument."); *see also Turner v. Houston Agr. Credit Corp.*, 601 S.W.2d 61, 65

54

(Tex.Civ.App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.)("As a general rule, one who seeks in equity to have a contract rescinded must offer to make restoration to the other party of that which was received by him under the contract."); *Raney v. Mack,* 504 S.W.2d 527, 534 (Tex.Civ.App.--Texarkana 1973, no writ)("Restoration, or offer to restore, consideration received. Such is a condition precedent to the granting of relief by way of cancellation or recision [sic]. She who seeks equity must first do equity.").

This principle also answers Richard's claim of surprise. He should not be surprised by a requirement that PMI return the amount it was paid for the stock if the issuance was rescinded. Those seeking equitable rescission are rarely entitled to have their cake and eat it to. *See Texas Co. v. State*, 281 S.W.2d 83, 91 (1955)("[O]ne seeking a cancellation of an instrument, with certain exceptions not pertinent here, must restore the original status . . . ."); *Tex. Employers Ins. Ass'n v. Kennedy*, 143 S.W.2d 583, 585 (1940)("The general equitable rule is that a plaintiff in a suit for the rescission or cancellation of a contract to which he is a party must return, or offer to return, any consideration which he has received under the contract."); *Gibson v. Lancaster*, 39 S.W. 1078, 1079 (1897)("[I]f any part of the purchase price has been paid, in order to [obtain] a rescission the money so paid must be tendered by the seller to the purchaser."). Nor did the probate court abuse its discretion in failing to carve that issue off for additional discovery. The potential offset that Richard suggests--the payment of attorney's fees by PMI to the estate representatives--was already documented. Appellants' counsel had also sought its fees and submitted its billing memos in support of that claim. If Richard had some discreet offset based on those fees that the probate court should have considered, he could have evidenced and asserted it below. We recognize that in *Cherry* the reimbursement claim was remanded for a fact finding. That was so because the trial court had never undertaken any determination of the amount. Here the trial court had before it

evidence of the amount of the stock purchase. We see no reason to prolong this litigation with a remand to search for possible offsets that could have been addressed prior to entry of the judgment. Richard's second cross-issue is overruled.

### D. Attorney's Fees

#### 1. Relevant Background

Both Richard and the Appellants sought their attorney's fees based on the competing claims for declaratory relief. Rather than submit the amount to the jury in the phase-two-trial, both sides agreed to submit the issue to the trial court, and did so based on affidavits, billing records, and a stipulation.

In relevant part, the stipulation stated that both sides agreed that $1,186,000 constituted a "reasonable and necessary" attorney's fee award for either Richard, or the Appellants. But while the parties agreed not to dispute that amount, the stipulation acknowledged that the probate court "may or may not agree that such amount is reasonable and necessary[.]" Richard's application for fees also included the affidavit of an expert witness who opined that the stipulated amount was a reasonable and necessary fee under the factors set out in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997). Richard further submitted as exhibits his attorney's fee bills from the several law firms who represented him over the course of this litigation.[20]

The probate court awarded $232,455.62 to Richard as attorney's fees. In a letter ruling, the trial court identified two of the factors it considered in arriving at this amount: (1) the maximum approved rate for attorney's fees in that court is $350.00 per hour for attorneys and

---

[20] Richard at one time or another was represented below by eight law firms: Blanco Ordonez Mata & Wallace, P.C.; Neill & Moody, P.C.; Doris Sipes; Beck & Hall, P.C.; McKee, Voorhees & Sease, PLC; Baker Botts, LLP.; and as of the time of trial by Brewer Attorneys & Counselors, along with Gordon David Johnson & Shane, P.C.

56

$100.00 per hour for non-lawyer professionals; and (2) the probate court did not approve any fees "where the entry on the bill was redacted." In his last cross-point, Richard contends that the trial court abused its discretion in making an award that was one-fifth of the stipulated amount of reasonable and necessary attorney's fees. He contends that the limitation on the hourly rates and preclusion of redacted time entries is arbitrary and unreasonable.[21]

### 2. Controlling Law and Standard of Review

Under the declaratory relief act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX.CIV.PRAC.&REM.CODE ANN. § 37.009. By its terms, the act provides four criteria guiding the award of fees: (1) reasonableness, (2) necessity, (3) equity, and (4) justness. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998). The reasonable and necessary requirements are questions of fact to be determined by the fact finder. *Ridge Oil Co., Inc. v. Guinn Investments, Inc.,* 148 S.W.3d 143, 162-63 (Tex. 2004). The equitable and just requirements are questions of law for the trial court to decide. *Id.* Whether to award fees and what amount is equitable and just are questions committed to the trial court's discretion. *Id.* at 161-62. Whether it is "equitable and just" to award attorney's fees depends not on direct proof, but on the concept of fairness, given all the circumstances of the case. *Id.* Although a fact finder may determine the value of the reasonable and necessary fees, it remains for the court to determine how much, if any, of those fees would constitute a just and equitable award. *Id.* Or as stated in *Bocquet*: "[u]nreasonable fees cannot be awarded, even if the court believed them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees." *Bocquet*, 972 S.W.2d at 21.

---

[21] In his reply brief, he also suggests the amount if unfair because the stipulated amount does not include anything for the appeal. A reply brief is not the place to raise a new substantive issue on appeal. *E.g. Fox v. City of El Paso*, 292 S.W.3d 247, 249 (Tex.App.--El Paso 2009, pet. denied)("The Rules of Appellate Procedure do not allow an appellant to raise an issue in a reply brief which was not included in his original brief.").

We review the award of attorney's fees under the declaratory judgment act for an abuse of discretion. *Ridge Oil,* 148 S.W.3d at 163; *Bocquet*, 972 S.W.2d at 20-21. A trial court abuses its discretion when it rules arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence. *Bocquet*, 972 S.W.2d at 20-21. In summary, we are required to determine whether the evidence supports the reasonableness and necessity of the fee award, and whether the award was inequitable or unjust. *Id.*

### 3. Application

We reject Richard's cross-point for several reasons. First, the trial court as the fact finder could have rationally limited the rates charged to the prevailing rates in the relevant market area. One of the *Arthur Anderson* factors allows the fact finder to consider the fee customarily charged in the locality for similar legal services. 945 S.W.2d at 818. While Richard focuses on the stipulation for this amount, "[t]rial judges can draw on their common knowledge and experience as lawyers and as judges in considering the testimony, the record, and the amount in controversy in determining attorney's fees." *Protect Environmental Services, Inc. v. Norco Corp.*, 403 S.W.3d 532, 543 (Tex.App.--El Paso 2013, pet. denied)(holding that trial court could reduce fees even though attorney's testimony was uncontroverted). "Trial courts are considered experts on the reasonableness of attorney's fees." *McMahon v. Zimmerman*, 433 S.W.3d 680, 693 (Tex.App.--Houston [1st Dist.] 2014, no pet.); *see also In re TMT Trailer Ferry, Inc.*, 577 F.2d 1296, 1304 (5th Cir. 1978)("[A]ppellate courts, as trial courts, are themselves experts as to the reasonableness of attorneys' fees . . . ."). When serving as the fact finder, a trial court can look at the entire record and use its common knowledge and experience as a lawyer and judge to decide a reasonable fee. *McMahon*, 433 S.W.3d at 693; *Garrod Investments, Inc. v. Schlegel*, 139 S.W.3d 759, 767 (Tex.App.--Corpus Christi 2004, no pet.); *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373,

387 (Tex.App.--Dallas 2013, no pet.)(stating that trial court need not hear evidence on every relevant factor to determine reasonable attorney fees and holding that court can look at entire record and use common knowledge of participants as lawyers and judges to decide reasonable fee).

Even aside from the trial court's own knowledge, the billing statements admitted as exhibits from the various law firms demonstrated a wide range of billing rates. For instance, the senior attorney billing rates varied from $250 to $1,400 per hour. The billing rates for non-lawyers ranged from $50 to $700 per hour. Richard's attorney's fees expert did not provide any testimony on the prevailing rates for these type of services in the relevant market place. The trial court, however, could have discerned those rates from the billing statements before it. For a time, Richard was represented by several El Paso firms whose senior partners billed just at or somewhat below the $350 per hour rate. Local non-lawyer staff were billed anywhere from $50 to $125 per hour. Thus, even if the trial did not know the local market rates, it had some evidence of those rates in the record from Richard's own bills.

Next, Richard claims an *ad hoc* rule preventing the use of any redactions in his billing memos put him to the Hobson's choice of not proving his entitlement to fees or waiving his privileges. Redactions indeed present a dilemma. As the fact finder, the trial court must be provided enough information to evaluate whether the service was in fact reasonable and necessary. *McGibney v. Rauhauser*, 549 S.W.3d 816, 821 (Tex.App.--Fort Worth 2018, pet. denied) (remanding trial court's award of fees based on billing memos that "were so heavily redacted that the trial court could not possibly have had sufficient evidence to determine that the entire amount" was reasonable and necessary); *see also Sullivan v. Abraham*, 488 S.W.3d 294, 299-300 (Tex. 2016)(under Texas Citizens Participation Act, noting that billing descriptions must be specific enough to allow trial court to meaningfully review the fee application).

Almost all the billing statements here contain redacted time entries, with some redactions so extensive as to preclude any understanding of the task performed. For instance, some redactions left only the initials of the time keeper, the billing rate, and the amount charged.[22] Almost every time entry that references legal research redacts the topic being researched. Yet how could the trial court ever evaluate whether the time spent was reasonable in light of the legal issue being analyzed, or whether it was even necessary for the declaratory relief sought? Other redactions appear to hide the substance of any communications between lawyer and client and the subject of many intra-firm communications. While we are sensitive to the privilege issues at stake, it was Richard who put the billing statements into evidence to tax part of his attorney's fees against Dick's estate. *See Ideal Elec. Sec. Co., Inc. v. International Fidelity Ins. Co.*, 129 F.3d 143, 152 (D.C. Cir. 1997)(noting aspect of waiver of attorney client privilege in claim for attorney's fees supported by billing statements); *Rauhauser*, 549 S.W.3d at 823 n.24 (acknowledging the privilege issue but noting "[w]hen seeking affirmative relief, the attorney-client privilege cannot be used both as a shield and a sword.").[23]

We conclude that that trial court had the prerogative and some evidence to support its finding as to a maximum prevailing rate for the services offered. We also accord the trial court latitude to reject redactions that prevent it from meaningfully evaluating the reasonableness and

---

[22] Here is a time entry for Rodolfo Mata of the Blanco Ordonez Mata & Wallace firm exactly as it appears in our record:



6/30/2016 RM 4.50 1,012.50
225.00/hr

[23] One author suggests the use of *in camera* submission of billing memos containing actual privileged information. Joseph F. Cleveland, Jr., Alex Harrell, *Is Texas Becoming the Lodestar State? A Practitioner's Guide to Recovering Attorneys' Fees Under the Lodestar Method*, 16 J. Consumer & Com. L. 79, 81 (2013)

necessity of the legal services on the billing entries. Aside from that, Richard has failed to demonstrate any other reductions, based on properly redacted time entries, that materially affect the fee awarded. Stated otherwise, he fails to show harmful, and thus reversible error.

Richard also argues in part that the trial court abused its discretion in overlooking the parties' stipulation. Yet the stipulation by its own terms does not bind the court, nor does it address the equity and fairness consideration in the fee award. Even if a reasonable and necessary fee is determined by a jury or stipulation, the ultimate award must still be equitable and fair, as determined by the trial court. *See Ridge Oil Co., Inc.*, 148 S.W.3d at 162 (trial court justified in reducing jury finding of reasonable and necessary amount); *Approach Resources I, L.P. v. Clayton*, 360 S.W.3d 632, 639-40 (Tex.App.--El Paso 2012, no pet.)(trial court justified in reducing stipulated amount of reasonable and necessary fees). Here, we note that the attorney's fee award could only be taxed against Dick's estate, and presumably out of the residue that would otherwise flow into the pour over trust. As such, the parties who would bear the burden of the award could only be Richard, Troy's trust, or the Poe Foundation, all at the election of the trustees. Because Richard consistently claimed at trial that he was not asserting any claim against Troy or his trust, the trial court could have in equity and in fairness limited the award of attorney's fees.[24]

## CONCLUSION

We overrule Appellant's Issues One, Two, Three, Ten, and Eleven and affirm the declaratory judgment canceling the stock issuance. We deny Issues Four, Five, Six, Seven, Eight,

---

[24] Richard's argument also assumes that the two reasons stated in the trial court's letter ruling constituted the only basis for its reduction, ignoring the equitable and justness requirements. But here, no findings of fact were requested as to the award of attorney's fees. The trial court's letter ruling does not suggest it was intended to constitute findings of fact, nor that the two factors were the only factors it considered. *See Moore v. Jet Stream Investments, Ltd.*, 315 S.W.3d 195, 209 (Tex.App.--Texarkana 2010, pet. denied)(finding that letter ruling, though filed with the clerk, did not specifically state that it is intended to set forth the trial court's findings of fact and conclusions of law and could not be considered as such); *Shamrock Foods Co. v. Munn & Associates, Ltd.*, 392 S.W.3d 839, 843 n.4 (Tex.App.--Texarkana 2013, no pet.)(same).

61

and Nine as moot, given they pertain to Questions One, Two, and Three, and are thus unnecessary for us to reach. We sustain in part Richard's Cross Point One, but only to the extent of his claim for disgorgement against Anthony Bock and Paul Sergent, Jr. under a fiduciary duty of loyalty claim as explained in this opinion, and his cross point as to the conspiracy claim against Paul Sergent, Jr. We overrule his Issue One in all other respects. We also overrule Richard's Issue Two and Three.

August 28, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

62